Filed 4/28/23  In re J.G. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.G., a Person Coming Under the Juvenile Court Law. | B318657 (Los Angeles County Super. Ct. No. 21CCJP04881B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.G.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Robin R. Kesler, Judge Pro Tempore.  Reversed and remanded with directions.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane E. Kwon, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, M.G. (father) challenges the juvenile court's jurisdictional findings and dispositional orders related to his two-year-old son, J.G. (son). In particular, father argues substantial evidence did not support a finding that father put son at risk and the juvenile court erred in requiring father to participate in court-ordered services.

Initially, we address the justiciability of father's appeal. While his appeal was pending, the juvenile court terminated its jurisdiction and issued a final custody order granting joint legal and physical custody of son to father and son's mother. Although the juvenile court's postappeal orders rendered father's appeal moot, we exercise our inherent discretion to address father's challenge to the juvenile court's jurisdictional findings. (*In re D.P.* (2023) 14 Cal.5th 266.) However, we decline to address father's challenge to the court's dispositional orders.

As discussed below, we conclude substantial evidence did not support the jurisdictional findings against father. Therefore, we reverse and order the jurisdictional findings vacated as to father only. Our decision does not affect the juvenile court's findings and orders as to son's mother.

## BACKGROUND

### 1.    The Family

Son is father's only child. Son's mother, L.G. (mother), and son both tested positive for amphetamines at son's birth. Mother has one other child, a six-year-old daughter, son's half sister (half sister). Although not half sister's biological parent, father has been a father

figure to half sister. Mother and half sister are not parties to this appeal and are mentioned only to the extent relevant.

## 2. Events Preceding the Petition

In August 2021, when son was two years old, the family court issued a custody order granting father sole physical custody of son and joint legal custody of son to mother and father. Mother was granted reasonable visitation.

On September 8, 2021, soon after the family court issued its custody order, father met mother at a motel to discuss mother's visits with son. At the time, son was at home with his paternal grandmother and aunt, with whom father lived. Half sister was with mother at the motel. While at the motel, father and mother began arguing over the family court order.

According to father, mother became aggressive, causing father to react in self-defense. Father said mother threatened to use pepper spray, which prompted him to try to leave the motel room. Mother blocked the doorway, swung at father with her fists, then bit him on his left bicep, leaving a mark. Father stated he then "shove[d] mother away from him using his hand on her forehead," which allowed father to leave the room and drive home. Father said mother drove after him with half sister in her car. According to father, mother was driving on the wrong side of the road and running red lights. On his way home, father called his sister (paternal aunt) to tell her mother was following him home and to lock the doors to the house. Once home, father called law enforcement to help de-escalate mother's behavior. Father stated the police officers almost arrested him because mother stated father shoved her. Father explained mother bit him and he had acted in self-defense. A responding officer saw the bite mark on father's arm. Consequently, mother was arrested for domestic violence, but father said he would not press charges. Father had not wanted mother arrested but only wanted law enforcement to help calm her down.

Mother provided a different description of her altercation with father. According to mother, father had "blindsided her with the custody order." Mother said she had allowed son to stay with father for

a couple of days just prior to their meeting at the motel. When she and father met at the motel, father said he had obtained the custody order giving him sole physical custody of son and that mother could not have son back with her. Mother said father told her to " 'forget about [son] and focus on caring [for] your daughter.' " Mother tried to leave the motel room with half sister. Mother said "father then pushed her backwards from her shoulders" and " 'shoved her out of the way.' " Mother said she bit father on his arm in self-defense. Another time, mother stated she bit father because he "grabbed her by the neck." Mother explained she was arrested at father's home because father had called law enforcement and there was physical evidence she had bitten father.

We refer to parents' September 8, 2021 argument that began at the motel and continued in front of father's home as the September 2021 altercation. Following that altercation, a referral was made to the Los Angeles County Department of Children and Family Services (Department), citing concerns for son and half sister's emotional and physical safety.

One week after the September 2021 altercation, mother and father had another physical argument regarding son. According to father, he found mother and half sister sitting on the street in front of his house. Mother asked to see son and, after moving one block away from father's home (because paternal grandmother did not want mother near the home), father obliged. During the visit, mother grabbed son and told father he would never see son again. Father tried to grab son from mother's arms but let go because he did not want son to get hurt. Mother ran with son in her arms around the block and into people's yards. Father ran to his house, called law enforcement, and retrieved the custody order. After that incident, father did not want mother to visit son.

According to mother, she had arranged with father in advance to visit with son in father's neighborhood. During the visit, mother asked father if she could take son and half sister for a walk. Although father said no and indicated the visit was over, mother started walking with

the children because she "saw nothing wrong with her wanting to walk with the children around the block." Mother said she did not run with son around the block, explaining "that would be impossible due to her height and caring [*sic*] a 2 year old child." Mother believed father overreacted to the situation.

Toward the end of September 2021, a Department social worker spoke with half sister. Half sister told the social worker she was not fearful of father but he was " 'mean to my mom.' " Half sister stated father refused to allow mother and half sister to see son. She also said one time father told mother, " 'You can't have [son],' " and put both of his hands to mother's neck. Half sister could not remember where or when that happened. She said she had never seen mother physically hurt father.

During the Department's investigation of the family, mother was observed to act erratically at times, was difficult to contact, did not have a permanent home, and had problems with voluntary drug testing. There were concerns mother may have been using drugs.

In mid-October 2021, the Department obtained a removal order to remove both children from mother's care. Son was placed with father.

**3.  Petition and Detention from Mother**

On October 19, 2021, the Department filed a seven-count Welfare and Institutions Code section 300 petition on behalf of son and half sister (petition).[1] As to father, the petition alleged two identical counts, one under subdivision (a) and one under subdivision (b) of section 300. Those two counts (counts a-1 and b-1) alleged the children were at risk of serious physical harm due to mother and father's violent September 2021 altercation. Mother's alleged conduct was the subject of the remaining counts. Those counts were brought under subdivisions (b) and (j) of section 300 and alleged the children were at risk because of mother's history of substance abuse, mother's reckless driving while

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

5

under the influence and with half sister in the car, and mother's creation of a detrimental and endangering home environment.

At the detention hearing held a few days later, the juvenile court detained son from mother and released him to father under Department supervision. The court stated, "Not only did mom engage in a physical assault upon father . . . in front of [half sister], she drove very erratically with [half sister] in the car. . . . [S]he was driving on the wrong side of the road. She was running red lights. She was driving very, very unsafe with [half sister] in the car; that absolutely places [half sister] at risk." As to son, the court noted mother also placed son in harm's way when she ran away with him during a visit.

### 4. Adjudication

#### a. Continued Investigation

Prior to adjudication, the Department continued its investigation. A Department social worker spoke separately with mother and father.

Father reiterated what he previously had reported about the September 2021 altercation. He added that he told mother he did not want to keep son from her but wanted them "to co-parent better." Father said that, as he was trying to leave the motel room, mother "was pushing me and her daughter [half sister] was in front of the bed watching the whole thing. . . . I asked why was she doing this in front of her daughter. That's when I reached for the door and she bit my shoulder, the inner arm at the top. She bit me and locked on me. I grabbed her by the neck and told her to get the f*ck off of me. I didn't just choke her. I grabbed her by the neck to get her off of me. She was locked on my arm like a piranha or pit-bull. I told her to get off of me. She was crying on the floor. She got up and got in front of the door again and tried to hit me again." Father also stated mother tried to stop father from driving away from the motel in his car. She stuck her arm in his open car window, which father then rolled up on her arm. Father said mother was "making a scene" so he unrolled his window and tried to drive away. Mother then "ran into [his] car like a football player," fell to the ground and said to father, "[L]ook what you did to me." Father also said the day mother was released from jail (after her

6

arrest following the September 2021 altercation), she came to father's home. Parents had another argument regarding son, during which mother "ripped the chain off [father's] neck," leaving burn marks on father's skin.

Mother also reiterated what she previously had told the social worker about the September 2021 altercation. Mother believed father had tricked her by obtaining the custody order giving him sole physical custody of son. She said father told her to forget about son and to take care of herself and half sister. Mother insisted father tried to prevent her from leaving the motel room by "pushing [her] back." Mother said she was dodging father and she pushed him. She said, by the third push, she "grabbed his arm and bit him."

The social worker also spoke with half sister again about the September 2021 altercation. Half sister stated mother and father were talking when mother bit father, but she "didn't really see it." Half sister said mother and father were fighting, father "was holding [mother] down," and "he got her by the arm and held her down." Half sister explained she "was sad," "was crying," and "was really scared, because boys can't hit girls."

In its adjudication report, the Department noted no concerns for "[son] in the care of father" and stated son "is being well cared for by the father." The Department reported father was appropriate with son and had demonstrated his ability to supervise and protect son from exposure to further violence, stating that father's "pro-activity in caring [for] and protecting [son] is demonstrated in his filing for custody of [son]."

Just prior to the adjudication hearing, the Department reported one of its social workers had met with father and son monthly for the past three months and no concerns were noted. The Department stated father was "currently compliant, properly caring for the child, and there are no concerns at this time for the family." Nonetheless, the Department asked the juvenile court to declare son a dependent of the court and place him in the Department's care and control, with a

"Home of Parent-Father order contingent upon the father complying with all court orders."

### b. Hearing

The adjudication was held on January 5, 2022. At the hearing, counsel for the Department urged the juvenile court to sustain all counts of the petition. Regarding the counts related to the September 2021 altercation, counsel stated, "It's a bit of a he said/she said between the parents, but what is clear is that there was mutual violence between the parents" and "ongoing violence between the parents." As to the remaining counts related to mother's conduct, the Department argued the evidence supported the allegations of substance abuse, reckless driving with half sister in the car, and an endangering home environment.

Father's counsel argued father should be nonoffending and urged the juvenile court to dismiss the subdivision (a) count, which (along with one subdivision (b) count) concerned the September 2021 altercation.

On the other hand, counsel for mother argued the juvenile court should delete mother's name from the two counts pertaining to the September 2021 altercation. Counsel argued father was the aggressor and half sister's statements supported mother's description of the altercation. Mother denied she was the initial aggressor. Counsel for mother also asked the court to dismiss the counts alleging mother's substance abuse, reckless driving with half sister in the car, and creation of a dangerous home environment. Counsel claimed those allegations were not supported by a preponderance of the evidence.

Counsel for son and half sister urged the juvenile court to sustain the counts pertaining to the September 2021 altercation as well as the counts regarding mother's reckless driving with half sister in the car. As to the September 2021 altercation, counsel stated, "I think it's pretty clear that this was a mutual, combative altercation." Children's counsel argued the court should dismiss the remaining counts pertaining to mother's alleged substance abuse and endangering home environment.

8

After hearing argument, the juvenile court amended the petition. The court amended the two counts related to the September 2021 altercation (counts a-1 and b-1) by noting half sister was the only child present in the hotel room during the altercation and father grabbed mother's neck in order "to get mother off father." The court sustained those two counts as amended. The court also slightly amended the count regarding mother's substance abuse (count b-2) and sustained that count as amended. Finally, the court sustained the counts pertaining to mother's reckless driving with half sister in the car (counts b-3 and j-1), and dismissed the counts related to a dangerous home environment (counts b-4 and j-2). The juvenile court found, "Both mother and father did engage in the domestic violence" and "mother's behavior, quite outrageous overall, in regards to trying to race father to his home in the car with the child with her, mother's physical violence, and father's response to that physical violence with his own violence puts the children at risk."

The court found son was a person described by subdivisions (a), (b), and (j) of section 300. Son remained released to father under Department supervision.

**5.     Disposition**

The juvenile court held the disposition hearing the following month, on February 17, 2022. At the hearing, counsel for father objected to the requirement that father participate in a full domestic violence program and instead requested the court order father to address domestic violence in individual counseling. Counsel for son did not object to father's request to address domestic violence in counseling or that he attend a shortened domestic violence program. Counsel stated, "I believe that mother was the main aggressor with the incident that occurred."

Following argument, the juvenile court declared son a dependent of the court and ordered family maintenance services for father, with enhancement services for mother. As to father, the court ordered a shortened domestic violence program, a parenting program, and

individual counseling. The court ordered son removed from mother and released to father.

**6.      Appeal**

Although somewhat confusing, it is reasonably clear from father's notice of appeal that father sought to appeal from the dispositional order, which is the appealable judgment. (*In re J.F.* (2019) 39 Cal.App.5th 70, 74.)  In his notice of appeal, father stated he appealed from the "Jurisdiction and Disposition findings made on 01/05/2022, including court-ordered case plan."  However, father failed to include the relevant disposition hearing date (i.e., February 17, 2022). Nonetheless, on the second page of his notice of appeal, father included the date of the disposition hearing.  We construe father's appeal to be from the court's February 17, 2022, disposition order, which encompasses the court's earlier jurisdictional findings.  (Cal. Rules of Court, rule 8.100(a)(2); *In re J.F.*, *supra*, 39 Cal.App.5th at pp. 75–76.)

**7.      Postappeal Termination of Dependency Jurisdiction and Final Custody Order**

In March 2023, while this appeal was pending, the juvenile court terminated jurisdiction and entered a final custody order, granting joint legal and physical custody of son to parents.

**DISCUSSION**

**1.      Justiciability**

Initially, we address the justiciability of father's appeal.  As noted above, while father's appeal was pending, the juvenile court terminated jurisdiction and issued a final custody order.  Also while this appeal was pending, our Supreme Court issued its decision in *In re D.P.*, *supra*, 14 Cal.5th 266, which addresses the justiciability of dependency appeals such as father's here.  Consequently, we asked the parties to address whether, under *In re D.P.*, *supra*, 14 Cal.5th 266, we can or should address the merits of father's appeal.

In response to our request, the Department stated it did "not object to this Court considering the matter based on the issues argued in the [parties' opening and respondent's briefs]."  Father argued *In re*

10

*D.P.*, *supra*, 14 Cal.5th 266, supports considering father's appeal on the merits.

Because the juvenile court terminated jurisdiction and issued a final custody order granting joint legal and physical custody of son to mother and father, we can afford father no " 'effective relief.' " (*In re D.P.*, *supra*, 14 Cal.5th at p. 277.) Thus, father's appeal is moot.[2] (*Ibid.*) Nonetheless, we exercise our inherent discretion to address the merits of father's appeal as to the jurisdictional findings against him. (*In re D.P.*, *supra*, 14 Cal.5th at p. 282.) The jurisdictional findings against father were based on "stigmatizing conduct" (i.e., engaging in domestic violence) and " 'could be prejudicial to [father] or could potentially impact the current or future dependency proceedings,' or ' "could have other consequences for [father], beyond jurisdiction." ' " (*Id.* at p. 285.) We decline to consider, however, father's challenge to the juvenile court's dispositional orders. Unlike the jurisdictional findings, we discern no reason, and father has failed to raise a reason, to exercise our inherent discretion to consider his challenges to those orders.

## 2. Jurisdiction

### a. Applicable law

In this case, the juvenile court exercised its jurisdiction under subdivisions (a), (b), and (j) of section 300. Because the two identical counts pertaining to father were brought under subdivisions (a) and (b), we focus on those subdivisions.

Under section 300, subdivision (a), a juvenile court may assert dependency jurisdiction over a child when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. For purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of

---

[2] Father's appeal also could be considered moot because, even if we agreed with father, dependency jurisdiction would have remained based on mother's conduct. (*In re D.P.*, *supra*, 14 Cal.5th at p. 283.)

injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm." (§ 300, subd. (a).)

Under section 300, subdivision (b)(1), a juvenile court may assert dependency jurisdiction over a child when, among other things, "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" "[t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child." (§ 300, subd. (b)(1)(A).)

"The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who *are at risk of that harm*.' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " 'The purpose of dependency proceedings is to prevent risk, not ignore it.' " (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.)

Nonetheless, "[a]lthough evidence of past conduct may be probative of current conditions, the court must determine 'whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.' [Citations.] Evidence of past conduct, without more, is insufficient to support a jurisdictional finding under section 300. There must be some reason beyond mere speculation to believe the alleged conduct will recur." (*In re James R.* (2009) 176 Cal.App.4th 129, 135–136, abrogated in part on another ground in *In re R.T.* (2017) 3 Cal.5th 622.)

### b. Standard of Review

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making

this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings [and disposition order] of the trial court." ' " (*Ibid.*)

"Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.) Substantial evidence " 'is not synonymous with any evidence. [Citations.] A decision supported by a mere scintilla of evidence need not be affirmed on appeal.' " (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

**c.    Substantial evidence does not support dependency jurisdiction based on father's conduct.**

Father argues substantial evidence does not support jurisdiction based on his conduct. Rather, father claims he properly cared for son, acted appropriately, and only in self-defense did he physically push mother away from him. On the other hand, the Department claims father "mutually engaged in domestic violence with mother" and lacked insight into his actions. The Department argues substantial evidence supports the juvenile court's jurisdictional findings as to father.

It is undisputed father never intentionally or otherwise physically injured son. It is also undisputed son was not with parents during the September 2021 altercation. In addition, the Department consistently reported father was taking good care of son, meeting his needs, and protecting him. During the pendency of the underlying proceedings, the Department did not express concerns for son's safety while in father's care. Son was never removed from father's custody and care. Significantly, although father acted violently during the September 2021 altercation, the juvenile court recognized father acted in self-defense. In fact, the juvenile court amended the two counts involving father's alleged conduct to include language that father

13

grabbed mother by the neck "to get mother off father"—i.e., in self-defense. Yet, the court then found father an offending parent based on those very same defensive actions.

Considering the totality of the record, we conclude substantial evidence does not support dependency jurisdiction under either subdivision (a) or (b) of section 300 based on father's conduct. The statements of mother and father as to the September 2021 altercation can be and have been characterized as a he-said, she-said scenario, and father admitted he physically pushed mother off him when she bit him. Yet, based on the evidence before it, the juvenile court determined father acted in self-defense during the September 2021 altercation. The court amended the two counts involving father's conduct (counts a-1 and b-1) to reflect that finding. On the record before us, we conclude a finding of self-defense is insufficient to support the court's jurisdictional findings against father under either subdivision (a) or (b). (*In re Yolanda L.*, *supra*, 7 Cal.App.5th at p. 992 [Substantial evidence " 'is not synonymous with any evidence. [Citations.] A decision supported by a mere scintilla of evidence need not be affirmed on appeal' "].)

Although we exercise our inherent discretion to address the jurisdictional findings as to father, we decline to address the juvenile court's dispositional orders as to father. Despite our conclusion that the jurisdictional findings as to father must be reversed, dependency jurisdiction still would have remained based on mother's conduct, which went unchallenged. The juvenile court may impose a dispositional order on a nonoffending parent, such as father here. (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1148.) Father has not given us a reason, and we can discern no reason, why we should exercise our discretion to address his challenge to the court's dispositional orders.

14

## DISPOSITION

The January 5, 2022 jurisdictional findings as to father only are reversed. The matter is remanded and the juvenile court is ordered to vacate its January 5, 2022 jurisdictional findings as to father only.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

15